Filed 5/26/22 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CRISTIAN CRUZ-PARTIDA,<br><br>    Defendant and Appellant. | A160334<br><br>(San Mateo County<br> Super. Ct. No. 16-NF-004951A)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on April 28, 2022, be modified as follows:

1.  On page 5, after the second full sentence on the page that begins "At the time of the sound," add as footnote 4 the following footnote, which will require the renumbering of all subsequent footnotes.

> 4 Detective Mark Kosta later testified that he measured the distance from the closed gate to the curb of the sidewalk as approximately 52 feet and the distance from the gate to the beginning of a brick area between the pathway and the sidewalk as approximately 28 feet. He did not measure the length of the brick area.

2.  On page 6, delete footnote 4, which begins "We reject," and replace it with the following footnote 5, which will require the renumbering of all subsequent footnotes:

5 As discussed below, we reject Cruz-Partida's argument that the trial court misapplied the law here by confusing the present ability to commit an assault with the actus reus necessary to uphold an assault conviction.

3. On page 16, at the end of the first paragraph, after the citation to "(*Rivera*, at p. 333.)," add as footnote 12 the following footnote, which will require renumbering of all subsequent footnotes:

12 Given this case law, we reject Cruz-Partida's argument that the trial court erred in denying his motion for judgment of acquittal, brought at the close of the prosecution's case, by conflating present ability with the actus reus necessary for an assault. In support of his acquittal motion, Cruz-Partida argued there was no evidence that he was shooting at either Nicholas or Steven, and the prosecution failed to provide evidence regarding the location of either brother at the time of the single gunshot. The court initially expressed concern with respect to the facts of this case given that assault requires an *act* that would directly and probably result in the application of force to Steven or Nicholas. The prosecutor responded by citing *Chance* and *McMakin* for the proposition that it does not matter whether Cruz-Partida was aiming at either victim. The court reviewed both cases, concluding that *Chance* discussed different fact situations focused on present ability but that it did not "think there's any question here that there was a present ability to inflict injury." The court then discussed the *facts* of *Chance*, noting that there was "no showing that the gun was ever trained on" the purported victim. When the prosecutor next mentioned that, in *McMakin*, the defendant pointed the gun so that the ball would strike the ground before it hit the purported victim but never discharged the weapon, the court responded, "that's the idea, which is more than we have here." The court then concluded: "[Cruz-Partida is] in the breezeway with the gun . . . prominently displayed so it can be seen from 60 to 70 feet away, which is what it sounds like the approximate distance was based on the measurements that were brought out during the

testimony. The gun can be seen, and we know the gun was loaded at the time. And that moment—putting aside the discharge of the weapon, that moment is an assault as I understand it from *Chance*. So with that, your [section] 1118 [motion] is denied." While the facts were not directly at issue in *Chance* because the defendant conceded his behavior established intent, it seems clear that the court was considering the facts of both *Chance* and *McMakin* in determining there was sufficient evidence of intent in this case. Regardless, even if the trial court misspoke or was confused, " 'we review the ruling, not the court's reasoning, and, if the ruling was correct on any ground, we affirm.' " (*People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12.) And we conclude that there was substantial evidence of intent before the trial court when it denied Cruz-Partida's acquittal motion. (See *McMakin*, *supra*, 8 Cal. at p. 548 ["When there is any competent evidence before the jury to show the intent to commit an assault, it is for them to determine the question of intention."].)

4. On page 17, after the fifth full sentence on the page, which begins "We conclude" and ends with "one of the two brothers," add as footnote 13 the following footnote, which will require renumbering of all subsequent footnotes:

> [13] In his petition for rehearing, Cruz-Partida argued that this analysis misstates the evidence because he never pointed the gun "in the direction" of the brothers or in their "general vicinity." It is true that there is no evidence that Cruz-Partida ever *aimed* the gun directly at either brother. However, Cruz-Partida, himself, testified that that he shot with his right arm across his torso to the left at about a 30-degree angle downward from parallel to the ground so that Steven "could back up." He also testified that Nicholas was about 21 feet away and Steven was 16 feet away and "slow rolling" towards him when he fired the shot into the dirt on the street side of the gate. Thus, the evidence clearly establishes that Cruz-Partida pointed the gun in the general vicinity of the brothers. Moreover, he also pointed

the gun in the direction of the brothers as opposed to, for example, behind him.

5. On page 17, at the end of the carryover paragraph, after the last sentence, which begins "In other words" and ends with "mens rea for assault in this case," add as footnote 14 the following footnote:

[14] In his petition for rehearing, Cruz-Partida unsurprisingly objected to the general rule we have articulated for determining whether a defendant's actions in displaying a firearm are sufficient to supply the mens rea necessary for assault. His argument that our analysis turns nearly every instance of brandishing a gun (§ 417, subd. (a)(2)) into the more serious crime of assault ignores the fact that displaying an unloaded gun without the present ability to apply force would not qualify as the more serious offense. We can also envision a scenario where a gun is displayed in a rude or angry manner, but other circumstances show that the armed individual has no intent to actually discharge it. In the end, our touchstone is *McMakin*, which, over a century ago, explained: "The drawing of a weapon is generally evidence of an intention to use it. Though the drawing itself is evidence of the intent, yet that evidence may be rebutted when the act is accompanied with a declaration, or circumstances, showing no intention to use it." (*McMakin*, *supra*, 8 Cal. at p. 549.) On the other hand, "presenting a gun at a person who is within its range . . . . accompanied by such circumstances as denote an intention existing at the time" is sufficient to provide the mens rea for assault, even when the gun is not directly aimed at the victim. (*Id*. at pp. 548–549.) While we recognize that these cases will always be fact-specific, we have simply attempted to identify here some of the "circumstances . . . denot[ing] an intention." (*Id*. at p. 548.) Thus, in *McMakin*, displaying a gun at an individual with whom he had a property dispute, along with a conditional threat to use it, was sufficient. In this case, Cruz-Partida's dangerous conduct in displaying and/or firing the gun, along with the bad blood between him and Nicholas and the other surrounding circumstances provide substantial

4

evidence of the mens rea for assault, even though there is no evidence Cruz-Partida actually aimed at either brother.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

Dated:

_____
MARGULIES, ACTING P. J.

A160334
*People v. Cruz-Partida*

5

Filed 4/28/22 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br><br>CRISTIAN CRUZ-PARTIDA,<br><br>    Defendant and Appellant. | A160334<br><br>(San Mateo County<br> Super. Ct. No. 16-NF-004951A) |

Defendant Cristian Cruz-Partida appeals from a jury verdict finding him guilty of assault with a semiautomatic firearm with a related special allegation of firearm use. On appeal, Cruz-Partida argues that insufficient evidence supports his assault conviction because there was no evidence his conduct was likely to produce injurious consequences. He further asserts that the evidence was insufficient to support the jury's necessary conclusion that he did not act in self-defense. We disagree with both contentions and affirm.

## I.

## BACKGROUND

On September 22, 2016, the San Mateo County District Attorney filed a felony information charging Cruz-Partida with the murder of Nicholas G. (Pen. Code,[1] § 187, subd. (a); count 1); the attempted murder of Steven G.

---

[1] All statutory references are to the Penal Code unless otherwise specified.

(§§ 664, 187, subd. (a); count 2); felony assault of Steven G. with a semiautomatic firearm (§ 245, subd. (b); count 3); and felony assault of Steven G. and/or Nicholas G. with a semiautomatic firearm (§ 245, subd. (b); count 4). Counts 1 and 2 were enhanced with allegations involving the intentional discharge of a firearm and great bodily injury. (§§ 1203.075, subd. (a), 12022.7.) Count 3 was enhanced by allegations of personal use of a firearm and great bodily injury. (§§ 12022.5, subd. (a), 12022.7, subd. (a).) Count 4 included a special allegation claiming personal use of a firearm. (§ 12022.5, subd. (a).)

The charges stemmed from two different altercations on April 25, 2016, both of which involved Cruz-Partida, Nicholas G., and Nicholas's brother, Steven G. Counts 1 through 3 relate to the shooting of Nicholas and Steven near Orange Memorial Park in South San Francisco, which led to Nicholas's death and injured Steven. In contrast, as the prosecutor made clear in her statements to the jury, count 4 relates solely to conduct which occurred prior to the park shooting outside of Cruz-Partida's nearby apartment. Because the jury ultimately acquitted Cruz-Partida of counts 1 through 3, we focus our factual recitation on the evidence adduced at trial with respect to count 4.

### A. *Prosecution Evidence*

Jury trial in this matter commenced on November 18, 2019. Melissa L. testified that she met Cruz-Partida at school when she was 13 years of age, and the two had an on-again, off-again relationship from 2009 to 2015. They had a daughter together in 2012. Melissa and her daughter lived in an apartment with Cruz-Partida, his parents, and his sister from approximately 2014 until early 2016. Access to the apartment was through either of two locked gates.

2

Melissa met Nicholas G. at work and began a dating relationship with him around November 2015. Cruz-Partida was living in the apartment off and on during this time, but she considered their romantic relationship to be over. Melissa identified Nicholas as her boyfriend and believed they had a serious relationship. Nicholas and Cruz-Partida had never met, but Nicholas knew where Cruz-Partida lived because he had been with Melissa when she went to the apartment to pick up her daughter. During the six months she dated Nicholas, Melissa spoke with Cruz-Partida via phone and text. Cruz-Partida was aware of Nicholas's relationship with Melissa.

On the evening of April 24, 2019, Melissa and Nicholas were in a serious car accident. While Melissa was being transported to the hospital, Nicholas looked through her cellphone, taking screenshots of various pictures and communications involving Melissa and other men that appeared on her phone, including a conversation in which Cruz-Partida called Nicholas "ugly." Early the next morning, Nicholas and Melissa engaged in a text conversation during which he was very upset and accused her of being unfaithful. By the end of the conversation, Melissa believed they had reconciled, as several of the last messages from Nicholas stated that he loved her. However, later that day, Nicholas texted her, stating: " 'I'm going to whoop your ex's ass.' " He also called her asking for the name of Cruz-Partida's girlfriend. At another point, he called to let Melissa know: " 'Your baby daddy wants to fight me. Talk to you later.' " Cruz-Partida also called Melissa, telling her that " 'they' " were at the house and that he told Nicholas " 'he didn't want to fight in front of the house.' "

Digital evidence showed that Nicholas messaged Cruz-Partida that afternoon, stating: " 'Aha, I already been hella times. I know where you live. . . . You pussy ass nigga talking over blood. Meet me at PD Valley right

now.' " Cruz-Partida responded: " 'Meet me at my house.' " Nicholas replied: " 'Ah, why you pussy, you now come PV, motherfucker.' " Cruz-Partida then suggested his "baby mama" could bring Nicholas to his house. And Nicholas stated: " 'I'll have Ashley [(Cruz-Partida's current girlfriend)] take me, bruh.' "

The neighbor who lived on the second floor of Cruz-Partida's three-unit apartment complex also testified. She confirmed that the only entrance to Cruz-Partida's apartment was through the two locked gates. On April 25, 2016, she heard arguing between Cruz-Partida and another individual who was later identified as Nicholas. Nicholas was with a second young man (his brother Steven), was "very angry," and was arguing with Cruz-Partida "over some woman." Nicholas stated, " 'She's mine,' " and " 'She loves me.' " Cruz-Partida responded that "he was with her" and they had "just had a baby." When she heard Nicholas say he was going to come back with some friends that night and kill Cruz-Partida, she called 911. Both Cruz-Partida and Nicholas were cursing at each other. Nicholas was trying to get Cruz-Partida to come out, saying: " 'You're a pussy. Why don't you come out? You're a chicken shit.' " The neighbor took pictures from her window in case the police didn't arrive in time.

The back and forth went on for 15 or 20 minutes. Cruz-Partida was telling Nicholas and Steven to leave. The neighbor could not see Cruz-Partida, but, at one point, she heard Nicholas say to him: " 'You think you're big shit because you have a gun' " or " 'I don't care if you have a gun.' "[2] Nicholas was pacing back and forth on the sidewalk and would take a

---

[2] A picture was found on Nicolas's phone of Cruz-Partida holding what appeared to the lead detective on the case to be a semiautomatic weapon similar to the one used in the alleged crimes. On our own motion, we augmented the record on appeal in this case to include People's exhibits A, B,

4

few steps towards Cruz-Partida, but she never saw him go in the gate. The neighbor saw Steven in the beginning, but he went over toward the next house, and she didn't see him again until after she heard a sound like a firecracker on the side of the house with the courtyard.[3] At the time of the sound, Nicholas was standing on the sidewalk, which was approximately 23 feet from the gate. Steven then joined Nicholas and they both ran away towards the corner of the street. The two young men disappeared from her view for about five minutes, then reappeared walking together with another individual. Eventually, all three moved out of sight. Thereafter, the neighbor heard three more firecracker sounds coming from the park.

Witnesses tracked three individuals heading from the apartment building to the park, one on a skateboard (Cruz-Partida) and the other two walking quickly behind him. Joseph G., who was sitting in his car in a nearby parking lot saw Nicholas catch up to Cruz-Partida and " '[get] in his face.' " Nicholas punched Cruz-Partida, who stepped back, pulled a gun out of his front pocket, and shot both Nicholas and Steven. Cruz-Partida then fled on foot.

Nicholas identified his shooter as Cristian Cruz to the first officer who responded to the scene. At the time of his arrest several days later, Cruz-Partida had a laceration on his left cheekbone. An officer collected a spent brass casing from some dirt in the courtyard at Cruz-Partida's apartment complex. It matched three other casings found at the scene of the murder,

---

and C, various depictions of this photograph which were admitted into evidence in the case. (Cal. Rules of Court, rule 8.155(a)(1)(A).)

[3] The neighbor acknowledged that if an individual walked down her neighbor's fence line towards the gate, she wouldn't have been able to see them. It was also unclear how much of Nicholas's pacing on the sidewalk an individual standing inside the courtyard would be able to see.

and all four casings were fired by a gun discovered on a bike trail near the park after the shooting. DNA from the gun was matched to Cruz-Partida. No weapons were found in the clothing collected from Nicholas and Steven. According to Melissa, Cruz-Partida called her after the incident, "gloating" about shooting Nicholas and Steven and stating: " 'Your boy is in the hospital. He got shot. He got what he deserved. He never should have caused problems with me. I'm gone. You're never going to see me again.' "

At the close of the prosecution's evidence, Cruz-Partida brought a motion for acquittal with respect to counts 1, 2, and 4. He argued there was insufficient evidence as to count 4, because there was no evidence that he was shooting at either Nicholas or Steven, and the prosecution failed to provide evidence regarding the location of either brother at the time of the single gunshot. The trial court initially found Cruz-Partida's count 4 argument the "most interesting." The prosecutor argued, however, that for purposes of an assault conviction it does not matter where a defendant was aiming or if the possible targets were out of range, citing *People v. Chance* (2008) 44 Cal.4th 1164 (*Chance*) and *People v. McMakin* (1857) 8 Cal. 547 (*McMakin*). After noting that the discussion of present ability to inflict injury in *Chance* was not at issue in the present case, the court denied the motion for acquittal, stating: "The gun can be seen, and we know the gun was loaded at the time. And that moment—putting aside the discharge of the weapon—that moment is an assault."[4]

---

[4] We reject Cruz-Partida's argument that the trial court misapplied the law here. As stated above, the court expressly acknowledged that the discussion of present ability in *Chance* was irrelevant to this case. It then went on, having reviewed both *McMakin* and *Chance*, to correctly state that there was sufficient evidence to proceed on the assault charge.

## B. *Defense Evidence*

Cruz-Partida testified in his own defense. At 2:05 p.m. on April 25, 2016, he received a direct message on his phone from an unknown sender saying, " 'What's up, bitch ass nigga?' " Thereafter, he received multiple threatening messages, and the sender identified himself as Nicholas. According to Cruz-Partida, he invited Nicholas to come to his house because he wanted to see if he really knew where it was. He was not jealous of Nicholas, as he had been dating another woman, Ashley, for four or five months. When Nicholas antagonized him by stating he would have Ashley bring him to Cruz-Partida's house, Cruz-Partida replied in kind, stating: " 'Where you at? I'll tell her pick you up. How my dick taste, though.' "

About 30 minutes later, Nicholas and another individual later identified as Steven arrived at his house.[5] Cruz-Partida admitted to being mad, but stated he was mad at Melissa, not Nicholas. He brought a gun when he went outside because he did not know what he was getting himself into. He asked the brothers to leave. Cruz-Partida claimed that the lock on the gate was broken at the time and also testified that he often hopped the gate, which was about eight feet tall. Nicholas was pacing back and forth on the sidewalk and did the talking, stating repeatedly: " 'Come out here and fight. Stop being a pussy. Stop being a bitch.' " Steven kept his hands in his pockets the whole time. Cruz-Partida took a video of the two brothers and could be heard stating: " 'This nigga over here recording me. He know I'm

---

[5] According to Cruz-Partida, their arrival prompted him to leave a voice message for Melissa that had been played for the jury in which he repeatedly called her a " 'fucking bitch' " and stated: " 'Bringing that rat, bringing that bitch ass nigga to my house, bringing that nigga Nick to my house, are you fucking serious?' "

the man.  This nigga ain't fucking with shit.  Where you supposed to be from, bruh?' "

As Nicholas paced, Steven was slowly moving closer.  Cruz-Partida could see Steven the whole time but could not always see Nicholas.  He pulled his gun out when Steven started "coming too close" and, ultimately, he fired his gun at the ground "[t]o scare them, tell them to leave."  At the time he fired the shot, Nicholas was about 21 feet away and Steven was 16 feet away and "slow rolling" towards him.  Cruz-Partida shot with his right arm across his torso to the left at about a 30-degree angle downward from parallel to the ground so that Steven "could back up."  He aimed towards the ground near a bush on the street side of the gate.  Nicholas responded that now Cruz-Partida was going to get caught as the police were going to come.  Nicholas threatened to break his windows if he didn't come out.

Aware that his mother and sister would be home soon, Cruz-Partida went into his apartment, grabbed his skateboard, and left toward the back alley.  Nicholas and Steven saw him and followed him, telling him to "fight, fight."  He told them "to leave [him] the fuck alone," but they persisted.  Steven still had his hands in his pockets, and Cruz-Partida was concerned Steven had a weapon, especially because the brothers did not seem scared that *he* had a weapon.  When they got to the park, Steven cut off his planned escape route and hit him hard.  Cruz-Partida had his hand on the trigger of his gun and accidentally fired a shot at the ground as he was pulling the gun out of his pocket.  He then fired at Steven and, when Nicholas started coming at him, he fired a third shot at Nicholas.  He did not want to kill anybody, but he was afraid.  According to Cruz-Partida, he possessed the gun for about a week before the shootings.  Although he had held other firearms on two

8

occasions, he had never fired a gun before and had no formal training related to firearms.

## C.   *Jury Instructions, Verdict, and Sentencing*

The case went to the jury with final instructions on December 16, 2019. Among the jury instructions, the trial court gave a modified version of CALCRIM No. 845 as follows:

"The defendant is charged in Counts 3 and 4 with assault with a semiautomatic firearm in violation of Penal Code section 245.

"To prove that the defendant is guilty of this crime, the People must prove: [¶] 1. The defendant did an act with a semiautomatic firearm that by its nature would directly and probably result in the application of force to a person; [¶] 2. The defendant did that act willfully; [¶] 3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [¶] 4. When the defendant acted, he had the present ability to apply force with a semiautomatic firearm to a person; [¶] AND [¶] 5. The defendant did not act in self-defense.

"Someone commits an act *willfully* when he does it willingly or on purpose.  It is not required that he intend to break the law, hurt someone else, or gain any advantage.

"The People are not required to prove that the defendant actually intended to use force against someone when he acted.

"No one needs to have been actually injured by defendant's act.  But if someone was injured, you may consider that fact, along with all the other evidence, in deciding whether the defendant committed an assault.

"A *semiautomatic pistol* extracts a fired cartridge and chambers a fresh cartridge with each single pull of the trigger."

9

On December 20, 2019, the jury returned verdicts of not guilty on counts 1, 2, and 3, but found Cruz-Partida guilty on count 4. It also found the related use enhancement true. The trial court sentenced Cruz-Partida on June 9, 2020. He received the lower term of three years in prison on count 4, plus the lower term of three years on the use enhancement, for a total of six years.[6] This timely appeal followed.

## II.

## DISCUSSION

### A. *Standard of Review*

The scope of our review in this context is well settled. " 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

---

[6] Cruz-Partida was also sentenced to an additional two years in prison for felony assault, gang participation, and battery with serious bodily injury—with enhancements for gang promotion and great bodily injury—based on an unrelated 2017 incident.

10

## B.   *Substantial Evidence Supports the Verdict*

### 1.   *Assault with a Semiautomatic Firearm*

Cruz-Partida argues he was improperly convicted of assault because there was no evidence that he did an act that would directly and probably result in the application of force to either Nicholas or Steven; nor, he claims, was he aware of facts that would lead a reasonable person to conclude that his actions would have had such an effect. In particular, he contends that firing one shot at the ground away from the two brothers was not likely to result in any injury, and thus such an act cannot supply the intent necessary to support the jury's assault finding. Cruz-Partida misapprehends the nature of this general intent crime.

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."[7] (§ 240.) Although the assault statute speaks of an unlawful *attempt*, the crime " 'is not simply an adjunct of some underlying offense [like criminal attempt], but [is] an independent crime statutorily delineated in terms of certain unlawful conduct immediately antecedent to battery.' " (*People v. Williams* (2001) 26 Cal.4th 779, 786 (*Williams*).) As a result, assault and criminal attempt require different mental states. (*Chance*, *supra*, 44 Cal.4th at p. 1170.) "[C]riminal attempts, because they require proof of specific intent, may be more remotely connected to the attempted crime." (*Id.* at p. 1167.) Assault, in contrast, is a general intent crime that "requires an act that is closer to the accomplishment of injury than is required for other attempts." (*Ibid.*) Under such circumstances, "a specific intent to injure is not an element of assault

---

[7] Assault with a deadly weapon is defined to include "an assault upon the person of another with a semiautomatic firearm." (§ 245, subds. (a)(2) & (b).)

11

because the assaultive act, by its nature, subsumes such an intent." (*Williams*, at p. 786; see also *Chance*, at p. 1167 [noting "established rule that assault is a general intent crime"].)

In *Williams*, the Supreme Court explained the mental state required to support a conviction for assault. (*Williams*, *supra*, 26 Cal.4th at p. 782.) Our high court had previously held that "the 'mens rea [for assault] is established upon proof the defendant willfully committed an act that by its nature will probably and directly result in injury to another, i.e., a battery.' "[8] (*Ibid.*, quoting *People v. Colantuono* (1994) 7 Cal.4th 206, 214 (*Colantuono*).) The *Williams* court clarified that "a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his [or her] conduct." (*Williams*, at p. 788.) Therefore, defendants "may not be convicted based on facts [they] did not know but should have known."[9] (*Ibid.*) "For example, a defendant who honestly believes that his act was not likely to result in a battery is still guilty of assault if a reasonable person, viewing the facts known to defendant, would find that the act would directly, naturally, and probably result in a battery." (*Id.* at p. 788, fn. 3.)

---

[8] " 'It has long been established . . . that "the least touching" may constitute battery.' " (*People v. Rocha* (1971) 3 Cal.3d 893, 899, fn. 12.) Thus, "[t]he terms 'violence' and 'force' are synonymous when used in relation to assault, and include any application of force even though it entails no pain or bodily harm and leaves no mark." (*People v. Flummerfelt* (1957) 153 Cal.App.2d 104, 106.)

[9] The *Williams* court was attempting to make clear that "mere recklessness or criminal negligence" were insufficient to support a conviction for assault. (*Williams*, *supra*, 26 Cal.4th at pp. 785, 787–788.) However, it noted that "recklessness" in this context is used in "its historical sense as a synonym for criminal negligence, rather than its more modern conception as a subjective appreciation of the risk of harm to another." (*Id.* at p. 788, fn. 4.)

To summarize:  Post-*Williams*, the "test for assault is whether a reasonable person, viewing the facts known to [the defendant], would find that the act in question would directly, naturally, and probably result in physical force being applied to another, i.e., a battery." (*People v. Bipialaka* (2019) 34 Cal.App.5th 455, 459.)  No specific intent to cause injury is required.  (*Williams*, *supra*, 26 Cal.4th at p. 790.)  Rather, the focus is on the "offensive or dangerous character of the defendant's conduct." (*Colantuono*, *supra*, 7 Cal.4th at pp. 214–215; see also *Williams*, at p. 785 [noting proper focus on the " 'violent-injury-producing nature of the defendant's acts' "].)  Cruz-Partida's assertions to the contrary notwithstanding, pointing a loaded gun at another individual and/or firing that gun in the vicinity of others has been found, under appropriate circumstances, to be sufficient to justify a charge of assault.

The oldest case touching on this issue is *McMakin*, *supra*, 8 Cal. 547.  There, John Green and the defendant had a dispute regarding certain land.  Green was horseback riding on a trail through those lands when he was intercepted by the defendant, who threatened to shoot him if he did not leave. (*Ibid*.)  At the same time, the defendant drew a revolver, "which he held in a perpendicular line with the body of Green, but with the instrument so pointed that the ball would strike the ground before it reached [Green], had the pistol been discharged.  [Green] turned his horse and rode off." (*Ibid*.)  In discussing the evidence of intent necessary for an assault, the Supreme Court stated that "presenting a gun at a person who is within its range . . . . accompanied by such circumstances as denote an intention existing at the time, coupled with a present ability of using actual violence against the person of another, will be considered an assault." (*Id*. at p. 548.)  The *McMackin* court noted that "[t]he drawing of a weapon is generally evidence

13

of an intention to use it." (*Id.* at p. 549.) In that case, the evidence was sufficient even though the gun was not pointed directly at Green, because there was no evidence rebutting the intention to use it and the defendant threatened to shoot Green if he did not leave.[10] (*McMakin*, at p. 548; compare *People v. Laya* (1954) 123 Cal.App.2d 7, 12, 16 (*Laya*) [assault on mother completed when she heard a struggle and shots at night, walked into her living room, observed her daughter's failed suitor on the front porch and her husband near the front porch door, and then witnessed the suitor point a gun at her which clicked twice but failed to fire; "[t]he mere pointing of a gun at a victim constitutes an assault with a deadly weapon, whether or not it is fired at all"].)

*Williams*, itself, is also instructive. In that case, two rivals for the affection of a woman (Nicholson) had a number of prior confrontations. (*Williams*, *supra*, 26 Cal.4th at p. 782.) On the day in question, King repeatedly telephoned Nicholson, trying to persuade her to accompany him and his two teenage sons on an outing. After she refused to speak to him, King drove to Nicholson's house with his sons, parking his pickup truck at the front curb. He left a note for Nicholson on the front door, knocked, and went back to his truck to wait. (*Ibid.*) Williams opened the front door and told King to stay away from Nicholson. He then got a shotgun from his truck (which was parked in the driveway), loaded it, and "walked back toward the

---

[10] *McMakin* thus also contains a discussion of assault by conditional threat. (*McMakin*, *supra*, 8 Cal. at p. 548.) The Attorney General argues at length that the conviction in this case can also be justified on that basis. However, we conclude that the evidence here is sufficient to support a general finding of assault and do not consider the Attorney General's alternate theory. (See *People v. Kunkin* (1973) 9 Cal.3d 245, 251 [we "cannot look to legal theories not before the jury in seeking to reconcile a jury verdict with the substantial evidence rule"].)

house and fired, in his words, a 'warning shot' directly into the rear passenger-side wheel well of King's truck." (*Id.* at pp. 782–783.) Williams acknowledged he saw King crouched behind his truck about a foot and a half from the rear fender well. No one was hit by the shot. (*Id.* at p. 783.) The Supreme Court concluded that Williams's firing of a "warning shot" toward the victim's truck with knowledge the victim "was in the near vicinity" sufficiently demonstrated "that his act by its nature would directly, naturally and probably result in a battery." (*Id.* at p. 790; see *People v. Raviart* (2001) 93 Cal.App.4th 258, 261–262, 264–265, 266–267 [upholding two convictions of assault with a firearm on a police officer under *Williams*; one officer rounded the corner of a building and the defendant pointed a loaded gun at him while the other officer crouched nearby around the corner; under the circumstances, pointing the gun at one officer was sufficient to effect an assault upon both of the officers who were pursuing him]; see also *Chance*, *supra*, 44 Cal.4th at p. 1175 [finding the application of *Williams* in *Raviart* "correct"].)

More recently, our high court confirmed that "pointing a gun at someone in a menacing manner is sufficient to establish the requisite mental state" for assault. (*People v. Hartsch* (2010) 49 Cal.4th 472, 507–508.) In that case, a woman heard something ram the front door of her apartment and, when she opened it, she saw the defendant in the passenger seat of a truck "not far from the door" pointing a gun at her. She slammed the door. (*Id.* at p. 507.) Hartsch argued under *Williams* that there "was no showing he knew that his actions that night would probably and directly result in a battery." (*Hartsch*, at p. 507.) The Supreme Court concluded that pointing the gun at the woman "under threatening circumstances" was sufficient to establish the mental state for assault. (*Id.* at p. 508.)

15

Finally, in *People v. Rivera* (2019) 7 Cal.5th 306, shots were fired from one vehicle towards another vehicle at an intersection.  After the individuals in the shooter's vehicle looked at them in a "threatening manner" and threw up their hands "like there was a problem," the victim driver was speeding away from the intersection when he heard three shots fired in rapid succession.  He was shot in the ankle.  The other passenger was not injured, but saw the driver display a handgun and fire three shots at them.  (*Id.* at pp. 316–317.)  The trial court failed to instruct the jury on the elements of assault.  (*Id.* at p. 332.)  The Supreme Court, however, concluded the error was harmless because the jury was properly instructed on personal use of a fireman—which requires that the defendant " 'intentionally displayed a firearm in a menacing manner, intentionally fired it, or intentionally struck or hit a human being with it' "—and the special allegation was found true as to each victim.  (*Id.* at p. 333.)  Citing *McMakin* and *Laya*, the court concluded that this "finding alone may be sufficient to establish assault." (*Rivera*, at p. 333.)

We discern from these cases the general rule that displaying a gun and/or firing it in the general direction of others is sufficient to provide the mens rea for an assault charge where there is animus between the defendant and the targeted party and/or the surrounding circumstances are fraught.  Thus, understanding the context is important.  Here, we note the following facts of which Cruz-Partida was aware:  Nicholas was currently dating Melissa, the mother of Cruz-Partida's young child.  Cruz-Partida remained in contact with Melissa, with whom he had had an on-again, off-again relationship for six years.  Cruz-Partida was aware that Nicholas had come to his house with his brother to fight him.  Both were angry during the altercation.  The two cursed at and antagonized each other repeatedly, both

16

in person and by text. Nicholas continually asked Cruz-Partida to come out and fight, and Cruz-Partida told him to leave over a period of 15 to 20 minutes. At one point, Nicholas said he was going to come back with some friends that night and hurt or kill Cruz-Partida. Steven had his hands in his pockets and was slowly coming closer. Cruz-Partida knew his gun was loaded when he intentionally pointed it in the direction of the brothers. He also testified he had never shot a gun before and had little firearm experience. We conclude that a reasonable person, knowing what Cruz-Partida knew at the time, would find that the act of pointing the loaded gun in the general vicinity of Nicholas and Steven during the continuing dispute would directly, naturally, and probably result in some type of physical force being applied to one of the two brothers. Thereafter, the situation became even more chaotic when Cruz-Partida purposely fired what he called a "warning shot" at the ground, with Nicholas about 21 feet away and Steven about 16 feet away. At either of these points in the altercation, the jury could reasonably infer that Cruz-Partida acted purposely to frighten the brothers with physical menace—acts which, by virtue of their nature, contemplate injurious consequences. In other words, Cruz-Partida's offensive and dangerous conduct along with the surrounding circumstances provide substantial evidence of the necessary mens rea for assault in this case.

## 2. *Absence of Self-defense*

Cruz-Partida nevertheless argues that there was insufficient evidence that he was not acting in self-defense when he displayed and fired his gun outside of his apartment, making his conviction for assault improper. In arguing that it was reasonable to take defensive action, Cruz-Partida focuses on the facts that Nicholas and Steven came to his apartment with the intent

to assault him and made repeated threats.  Cruz-Partida's argument, however, ignores our standard of review.

The parties agree on the applicable law.  To justify conduct that would otherwise be an assault on grounds of self-defense, a defendant " 'must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him [or her].' " (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064.)  "In other words, the defendant's belief must both subjectively exist and be objectively reasonable." (*People v. Brady* (2018) 22 Cal.App.5th 1008, 1014.)  "The threat of bodily injury must be imminent." (*Minifie*, at p. 1064)  Moreover, " 'any right of self-defense is limited to the use of such force as is reasonable under the circumstances.' " (*Id.* at p. 1065, citing Civ. Code, § 50 ["Any necessary force may be used to protect from wrongful injury the person . . . of oneself . . . ."].)  It is the prosecution's burden to prove beyond a reasonable doubt that the defendant did not act in lawful self-defense. (*People v. Lee* (2005) 131 Cal.App.4th 1413, 1429.)  However, as stated above, our review is for substantial evidence.

Here, the jury was properly instructed on the law of self-defense.  And it is clear they knew how to apply it, as they acquitted Cruz-Partida on the more serious charges associated with the altercation at the park.  Indeed, the jury asked several questions regarding the self-defense requirements.  For example, it sought clarification on what amount of time constitutes the " 'future' " in contrast to an "imminent" threat.  The court responded by referring the jury back to its instructions and stating:  "An imminent danger is one that is present in the situation when the defendant acted rather than a danger threatened at some future time."  It appears that the jury concluded that the threat of bodily harm was not imminent with respect to the assault

18

charge at Cruz-Partida's apartment, and substantial evidence supports that conclusion.

As detailed above, Cruz-Partida conceded that he thought Nicholas only wanted to engage in a fist fight with him. While he and Nicholas did trade insults outside his home, the exchange went on for a significant period of time without escalating. Rather, Nicholas kept demanding that Cruz-Partida come out and fight, and Cruz-Partida repeatedly asked the brothers to go away. Cruz-Partida admitted that Nicholas at one point stated that he would come back later with "friends," a comment his neighbor corroborated. However, this comment refers solely to a future threat and suggests that the standoff would likely end by the brothers retreating until a better opportunity presented itself. While they might also have reached the opposite conclusion, the jury could reasonably determine, on these facts, that Cruz-Partida was not responding to an imminent threat when he pulled out his gun and/or fired a warning shot.

The jury may also have reasonably determined based on the evidence presented that Cruz-Partida was not actually afraid of imminent bodily injury. He was on his home turf with a loaded gun, and there was no evidence either of the brothers had a weapon. Although Cruz-Partida testified he was afraid Steven might have a weapon because he always had his hands in his pockets, the jury could have discounted this testimony. Similarly, the only evidence that Steven was coming closer to Cruz-Partida before he fired the warning shot came from Cruz-Partida, himself. The neighbor testified that she could not see Steven until after the shot was fired. And there was an eight-foot gate nearby which Cruz-Partida could use as cover.

Finally, Cruz-Partida's own behaviors could be viewed as showing a lack of fear. When he took the video of the brothers standing outside of his apartment he could be heard saying: " 'This nigga ain't fucking with shit.' " Cruz-Partida testified he meant by this that "whatever [Nicholas was] doing [by trying to fight him] is not going to affect me." Finally, during closing arguments, the prosecutor referenced the picture taken by Nicholas of Cruz-Partida holding his gun, stating: "Does this person look scared? Because he said at this time he was afraid for his life. Look at his face. That is a big fat smile on his face. And you know why? It's because he knows he has the upper hand." Under such circumstances, the jury also could have reasonably concluded as much.

## III.

## DISPOSITION

The judgment is affirmed.

EAST, J.*

WE CONCUR:

MARGULIES, ACTING P. J.

BANKE, J.

A160334
*People v. Cruz-Partida*

---

* Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21

Trial Court:        Superior Court of San Mateo County

Trial Judge:        Donald J. Ayoob, Judge

Counsel:

Mary K. McComb, State Public Defender, Joy F. Haviland and Caroline C. Cincotta, Deputy State Public Defenders for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and George M. Hendrickson, Deputy Attorneys General for Plaintiff and Respondent.